Good morning, Your Honor. It is a privilege to make an appearance before such a distinguished panel in what is my first appearance for oral arguments. If I may please the Court, I am Surjit Singh, representing the Petitioner. The Petitioner in this case, Your Honor, gave... Could you talk just a little slower? Yes, Your Honor, I will. Very good. The Petitioner in this case gave very detailed and specific testimony as to his identity, his religion, his membership in a political organization called All India Sikh Students Federation, his support for demand for Khalistan, an independent Sikh state, his five illegal detentions ranging from two days to ten days, his beatings and torture that included being hung upside down from the ceiling, and the direct threat from the police to be killed in a staged encounter. The Petitioner's testimony was consistent at first the credible fear interview that happened at Mira Loma Detention Center, then in his written asylum application, and then in the hearing before the immigration judge. The testimony of the Petitioner was totally unchallenged, was totally unrefuted. The immigration judge still denied the claim of past persecution and well-founded fear of future persecution, stating that Petitioner's statement at the airport when he first arrived in the United States was inconsistent with his statements at three subsequent stages. First, that is not true. At the airport, the Petitioner was asked at page 170 of the record, do you have any fear about returning to India? He answered yes. Same interview, Petitioner also stated, quote, I want asylum so you can give me a new life, page 170, unquote. The interviewing officer at the airport did not elicit any further information to see if there was a logical asylum claim that this person may have. At the end of that interview, the officer asked him, quote, did you understand all the questions I have asked you? And the Petitioner answered, yes, but I'm under stress and don't remember my answers. The officer did not read back the statement to him. The officer did not make sure that Petitioner understood the answers and agreed with the answers. At the credible fear interview, the Petitioner was faced with this inconsistency at the airport statement and the statement he made before the officer at the credible fear interview. And the Petitioner answered, I was asked these questions at the airport, I thought you would all kill me, and he's referring to the uniformed officers at the airport, and he's talking to the uniformed officer at the Mira Loma Detention Center. Petitioner further testified, I was very tired, mentally upset, I did not know what I was saying at that time. After staying in this facility, now I realize. Petitioner gave the same similar explanations to the immigration judge. Petitioner states, I saw this police uniform and thought maybe these people should not start beating me as well. Petitioner also stated that I thought the two governments work hand in hand. And this court has observed in several cases that when an alien who has been subjected to abuse during interrogation by government authorities comes to this country, he may not be too forthcoming to reveal those details at the point of first contact with the uniformed police officers in this country. The immigration judge did not consider these explanations given by the Petitioner, but rather outrightly rejected those explanations, concluding that those were untrue. The judge also noted in his decision that whether the statement at the airport was read back to the Petitioner or not does not matter to me. The immigration judge also takes issue with Petitioner's identity. Petitioner's application and his testimony is well corroborated by the documentary evidence on record, which was admitted in record without objection, was never challenged. The originals were produced at the hearing, and the government did not choose to send those to forensics to see if these documents are, in fact, genuine or fraudulent. And the judge makes those presumptive conclusionary remarks, stating that obviously these documents were not particularly difficult to engineer. He does not explain what is the basis of his knowledge. The judge also states that the Respondent comes from a prosperous family and he's educated. He should have had a passport and he should have done some traveling. The judge does not explain what is the basis of this conclusion here. The immigration judge at the very outset raised the bar, set a very high bar for this particular Respondent. The judge required at the Master Calendar hearing, I want at least one witness. The judge again said, try to bring a corroboration witness if you can. The Respondent stated that he would locate, try to locate some witness and, if possible, bring the witness to the stand. During the hearing, the Petitioner explained that one of the witnesses, possible witnesses, Harjinder Singh, was afraid to testify because he travels back and forth to India so many times, he did not want to get in trouble with the police. The other possible witness had relocated out of California. Petitioner could not locate him. He contacted some other people whose immigration status was not known to the Petitioner and he said they were reluctant to testify because they don't want to get into any trouble. Immigration judge also took exception to Respondent's not producing any medical record of the injuries that he might have suffered. Respondent did testify that the doctor who treated him was personally known to the Respondent and he was treated, quote, unquote, in a hiding way, and the doctor told the Respondent that if police comes to know I treated you, they may come to me and allege that I am helping the Calispanese and I will not be able to give you any receipts or any record. Petitioner submitted affidavits from the witnesses who had personal knowledge of his membership, who had personal knowledge of his detentions, and the treatment made it out to him. The immigration judge does not give any weight to those affidavits and rejects them outright, saying, I just state that they carry no great probative value. They are not difficult to obtain fraudulently. Anyone with a notary seal could make that up. The documents that the Petitioner submitted in corroboration were totally unchallenged. The testimony that he gave at the hearing, at the credible fear interview, and in his asylum application was totally unchallenged and understated. And the testimony at these three stages, subsequent to the interview at the airport, were completely materially consistent with the stage prior. And I believe the Petitioner made a very sound claim of past persecution based on his membership in a political organization, his expressed political opinion, and the political opinion of others imputed to him. And after the Petitioner has established past persecution, the presumption of well-founded future persecution does attach. And Petitioner also has indicated that since he left India, the police are still interested in him and looking for him. So I believe Petitioner has made out a case for withholding of removal also based on the almost certainty of persecution were he to return to India. I submit the honors. Thank you, and I would reserve any time that I have left for rebuttal. Thank you, counsel. Good morning. Alison Igo representing the Attorney General. The immigration judge gave four specific and cogent reasons for finding that this Petitioner's testimony lacked credibility. While the Petitioner's attorney addresses the ID here, he didn't address the judge's concern with the ID either in his appeal to the board or in his brief to this Court, nor did he address the immigration judge's finding that the Petitioner did not establish his religion, nor did he address the issue, the immigration judge's finding of his failure to corroborate his testimony about his identity. The only issue that the Petitioner raised in his brief were a challenge to his prior statement, which he gave under oath, and the judge's refusal to accord any weight to the affidavits that he submitted. The ID in this case is extremely important. This is a man who came in with a false passport. He gave a different name. He gave a second different name at the airport, and only finally, after two interviews, gave what he claims to be his real name. He claims that he held on to a 1991 receipt, a payment receipt for dues in the All-India Sikh Students' Federation, and yet, when asked whether he had a birth certificate, said, well, I had one, but I don't have it with me now. He was given over 18 months to produce a witness to come in. The judge gave him the opportunity to produce anyone, and he said, I will even take a second, someone with secondhand knowledge to come in and say who you are. This petitioner lived with a man that he referred to as his uncle, who he claims grew up, came from the village that his mother came from. This man, Harjinder Singh, did not appear in court, yet the petitioner testified that this man has a green card. He has a he owns a restaurant here. He lives in the United States. The only thing that he was required to do was to come into court and say, yes, I know that man's mother. His name is Charanjit Singh. He didn't do that. And I think that the judge was reasonable in assuming that the failure of this witness to appear should be considered adverse to the petitioner. The petitioner claims that Harjinder Singh was afraid to come in because he travels back and forth to India, and yet he asked the immigration judge to give credence to two affidavits from people who still live in India and who supposedly gave detailed testimony about what happened to him. I mean, either you are afraid to give testimony or you're not afraid to give testimony. It doesn't work that way. The person who lives here, who is a legal permanent resident, who was only asked to come in to say, yes, I know that that's his name, did not appear, and yet he insists that the IJ should have given considerable weight to affidavits that he failed to authenticate, and his reason is, well, they could be the government could have submitted this for forensic examination. That is not the government's burden. It's the petitioner's burden to prove that he is eligible for asylum. He brought in documents that were not authenticated and which the judge gave no weight to. And the petitioner here argues that there's no reason not to give weight. There certainly was a reason to give weight. This is a man who was able to get a false passport, which is an official document of the government of India, and yet a passport that was sufficiently genuine to get him into the country, and yet he says that the immigration judge should have given weight to two documents that have a notarized stamp on it from India. I think the judge was absolutely reasonable in finding that these are, you know, no foundation laid for these documents that he wasn't going to give any weight to them. Second is, and the petitioner here argued that his testimony about his identification was unrefuted. It may have been unrefuted, but it was uncorroborated. And from his first appearance in court, the immigration judge told him that he was expecting a witness to come in. At his very last hearing, he said, I can perhaps try to get that document. He was on 18 months' notice to bring somebody in. He could have brought in a neighbor who said, I've lived with him for 18 months in this country. Since he arrived here, he's gone under this name. He's held himself out as torrential, saying he didn't even bring a neighbor. He didn't even bring somebody from his. But that wouldn't have proved that he was, that he hadn't just adopted the name. No, certainly not, Your Honor, but it would have at least given some weight to the claim that he was living under a name that he was claiming to be his. But is there any evidence that he was not living in the United States under that name? There's no evidence that he was. Nobody came in. He brought no documents. No, but I mean, you could say that about almost any asylum applicant. I mean, most people don't come in and prove their identity by saying, I went under this name in the United States. No, but they have some. So I echo Judge Reinhart's question. They have some sort of document to prove who they are. This individual had no documentation to prove who he was. They at least have, whether it be a rent receipt, whether it be – I mean, and the problem with this Petitioner is that he had available corroborating evidence. He had a person that he referred to as an uncle who he says grew up with his mother in her village. And this man could have come in and said, I knew his mother. I know who he is. I suppose his uncle said, yes, this is Hiram Singh, or whatever his name would have been, as opposed to somebody else. What does it really establish? Well, it establishes, first of all, his credibility about – I mean – But he's picked a name, and his uncle says, you know, that's the name. He's got the same name. I mean, it doesn't tell you anything about – It doesn't tell you much about whether his story is true, does it? Well, certainly, because if he's not representing who he truly is. And the reason that his identification is so important is because it's also important to the question of his religion. He's claiming to be Sikh. And generally, observant Sikhs can be identified by their name because they take the name Singh. In this case, the immigration judge went on to say, I don't know his identity and I don't know his religion. And again, the Petitioner says, well, his testimony was unrefuted. There wasn't a testimony. He marked a box on his application that said, I am Sikh. He gave no, and he claimed to have given – he claimed to have given a speech at an unnamed Gurdwara in Punjab. He didn't make any claims to attending a temple here. He didn't make any claims to keeping what they call the 5Ks, which are the basic tenets of a Sikh. I'm surprised. Aren't you kind of selling his testimony short because he testified that he's part of the All India Sikh Students' Federation, right? He goes on – he testifies in some detail about his activity. You said he didn't claim to be Sikh except checking a mark. I didn't say he didn't claim to be Sikh. I said he didn't prove to be Sikh. And he didn't claim that he kept the 5Ks. The documentary evidence that the country conditions show that the movement that he claimed that he supported was a movement that was supported by observant Sikhs. The reason for that was because it was a movement to establish a separate Sikh state that would be based on the tenets of the Sikh religion, and that in – not in general, but that there were observant Sikhs who supported this movement. This gentleman came into court, and he didn't even prove that he followed or he adhered to any of the basic Sikh tenets. Did anybody ask him? Was he asked whether he followed it? Because you're speculating on it. That's his burden. That's his attorney to ask him. I mean, it's not for the government to disprove that he's Sikh. It's for him to prove that he is and that – because if, in fact, you are basing a claim for persecution on the fact that you are Sikh, then you are – then you are required to prove that you are in the first instance. So his – the omission was that he didn't come in and say, I'm a Sikh, and I follow these five tenets or whatever they are. That's what he should have said, that I practice these five – Yes, and the reason for that is because – Why do you have to when you – I mean, we have a – we see a lot of Sikh cases, and you do too, and the fact of the – the All India Sikh Students' Federation is a common – why do you have to say, I follow the 5Ks or I know the 5Ks, if you start off by saying, here was the political movement in which I was involved, and the movement, of course, includes the idea of a separate – Because how do you know it was – how do you know – because anybody, any Indian could come in here and could say to you, and you would have no – and the immigration judge has no way of knowing. Anyone born in India could come in and get on a stand and say, I belong to the All India Sikh Students' Federation. And he could also say, I practice the five, whatever they are. But you're faulting it by – as inadequate by saying – No, that's true. But the cases – but the cases say – and if I could just – if I could just follow up this thought, because while the Petitioner's attorney says he gave very detailed testimony, I disagree with that. When you read this record, what he said was, I attended – I attended a rally and I shouted slogans, which is what having a lot of Sikh cases in front of this Court, as Your Honor noted, that is what everyone says. I shouted slogans and I was arrested and I was beaten on the heels with – with wooden batons. That is in almost every case. This gentleman only had to read one transcript to know what to come in and say. It's in the details of somebody's testimony. He didn't talk about where the rallies were. He didn't talk about what the rallies were for. And, in fact, in one very interesting claim he makes, he claims that in 1997, he was the chief minister of Punjab at that time to object to his running – his failure to control the police. There is no documentary evidence to support that. First of all, the documentary evidence says that there was very little – there were very few incidents after 1993. Here is a gentleman coming in and making a general claim of a rally in a different state. I mean, that's like going to Arizona to – to demonstrate against Governor Schwarzenegger. His testimony, a lot of it doesn't make sense. It's not detailed. He doesn't give the reasons. He doesn't give the names of the police stations. He doesn't give the – the area or the locale of – of any of the demonstrations that he attended. He talks about an SDM. But what about the incident in April 1999? I mean, that's fairly detailed. It's the type of detail. But it's not the type of – I must tell you, we see a lot of these cases, and this case has different details than the – what you call the generic read anything. I've never – I've never – in fact, I don't think I've seen this particular assertion before. What assertion would that be? I mean, we're talking about the details he reveals about the – on April 1st, 1999. This isn't a boilerplate claim, in my experience. You're claiming it's a boilerplate claim, that this is all made up. Okay. That we don't know that he's Sikh, but there's nothing in the record that indicates he's not Sikh. I'm not saying it's made up. I am saying to you that the – that the standard of review before this Court requires that you give deference to an immigration judge's adverse credibility determination. Right. And all you need to do is – I'm responding to your argument. I know at the standard of review, you don't need to lecture. I'm just – because time and practice. I don't believe I – pardon me if it sounds like I'm lecturing, but I'm arguing. Yeah, but that's fine. But my concern here is this. I mean, you're basically saying this whole thing is a sham and that anybody can come into it. And I don't understand your argument, because you say to prove that someone's a Sikh, you have to go through the five Ks, you have to go through the basic tenets of religion. You just can't come in and say, I was a member of the All India Sikh Students' Federation. We had this rally. I spoke. I was beaten. I mean, what about that indicates to you that this person's not a Sikh? I'm not saying he's not a Sikh. I'm saying that he did not prove – But that's where you started. You said he's not a Sikh. There's no proof he's a Sikh. No, I didn't say that. I said that there – that he did not prove, that the immigration judge found that his – that his testimony – the immigration judge had reasons to question both his identification and his religion, that he asked him specifically to bring in corroborating evidence. The new standard of review requires this Court to accept the availability of corroborating evidence. The immigration judge found there was corroborating evidence available. What new standard of review? The Real ID Act has changed. It doesn't apply now, does it? In this case, no, Your Honor. It does apply. That's not the standard of review. No, excuse me, Your Honor. It does apply. In this particular case, it does apply. The standard of review for orders of removal, it says specifically in the Real ID Act that it applies to, in subsection E, that it applies to cases that began before, on, or after. The standard that you – that does not apply are the standards that apply specifically to 208, which is the asylum. The standard of review for corroborating evidence applies to any cases that are pending right now on passage of the Act. I think that's an open question, isn't it? But – but the fact is, Your Honor, that this – this gentleman didn't – didn't provide any more – any more evidence, any more general statement than – than any other person who was familiar with the situation in India who could have – could have gotten on the stand. And the fact is that he – he talks about and he says – I'm telling you that he's – this is different. I mean, I'm not saying it's – it's – I'm not – I'm not saying we're not deferring, but you again are retreating to this is a boilerplate claim. And it's not a boilerplate claim, I can tell you, from seeing thousands of these. I'm not exactly sure which part of his 1999 – like, you didn't exactly say what it is that you find different, but having done 100 or 200 of these cases, I looked for something that distinguished this case from another case and didn't find it. And moreover, he talks about his testimony about the 97 and the 99 events do – are not consistent with the country condition reports. The country condition reports talk about very, very few incidents after 1993. And this gentleman talks about an incident in 97 that occurred in a – that didn't even occur in Punjab that – that he should have been able to provide some sort of – if there were a demonstration against the chief minister of Punjab in Rajasthan, a separate state in which he talked about 30 people being arrested, there should have been – I mean, when you read the country condition reports, they're detailed about the Jammu and Kashmir situation and about the incidents that go on up there, the situation with the Naxalites in southern India, the situation in Uttar Pradesh and in other areas. They give very detailed reports, and yet there is nothing – there are no incidents after 1993 that specifically talk about targeting separatists. And in fact, the country condition reports talk about the separatist movement really not being supported by the majority of the Sikhs in – in Punjab and certainly not by the Sikhs outside of Punjab. So the fact that he talks about – about if that is in fact the rally that you are referring to, I don't think it's that difficult to say, I attended a rally, I shouted slogans, or that I joined the All India Sikh Student Foundation. And in fact, when he was questioned about the All India Sikh Student Foundation, that was a very large student organization which had many, many factions. There was the Batu faction, there was the Manjit faction, and there were certain of the factions that were violent. And when he was asked about this, he claimed to have had a low-level position in this group. And yet when he was asked about the different factions, he had no knowledge. I mean, this is – this is a situation where the country condition reports talk about former members of the – of the All India Students – Sikh Students Federation going on to prominent positions in the state and national legislative circles where – Are you really arguing that – are you arguing that any claim of this type made after 1993 is necessarily precluded? No, not at all, Your Honor. I don't think that – in fact, the State Department has said that in rare instances there are people who were of high profile who do suffer targeting and – and certain types of surveillance on their return to India. But even people who were involved and whose names were known – I mean, this is a fellow who – it's really even hard to say. I mean, he first talked about having been a Sikh student, and then – and then when he was questioned about it, he really backs off the claim. He says, well, well, it's a very, very small group. There are only a handful of us in this organization. This is somebody who – I would say that if he – that given the country conditions after 1993, if he's talking about the police targeting him, and if he's talking about in 2000, as the Petitioner's attorney represented, the police coming to his house and chasing him, that he should have to present some sort of corroborating evidence when the country condition reports specifically don't support, when he has not proven his identification, when he has not proven his adherence to the religion that is the basis for the very movement. I would just like to briefly touch on the – the prior statement, which is the only basis. Very briefly. We've got 18 minutes out of 10. Which is the only basis on which he challenged the IJ's decision. This was a statement that was taken under oath. And although he says that he – that when he was asked, he specifically said, yes, I – I did understand the questions. I don't remember them now. He doesn't say they weren't true. At his initial interview, he made no claim about being afraid to return to India. He said, I need to have asylum because I've sold my property. I have nothing in India. I'm hoping you'll give me a new life here. And this is not a situation where there are minor differences. This is a situation where somebody came in, made absolutely no statement about anything – any abuse or any fear of returning to India, and six months later comes in with a fully detailed, according to the – if I were to accept the Court's belief that this is a fully detailed statement, it just doesn't make sense. This is an educated man who went through a year of law school. He was supposedly arrested on five different occasions. The first time did not deter him from attending rallies. It didn't deter him from putting himself supposedly in the line of fire, and yet he makes a claim here that he was so distressed that he couldn't so much as say to the officer, I'm seeking asylum because I was abused. This record fully supports the immigration judge's decision in this case, and I ask that the Court deny the petition. Thank you. As to the issue of country conditions, Your Honor, the immigration judge, in his order at page 26 of the record states, Respondent's attorney correctly observed that Respondent has given detailed information regarding his arrests and detentions and that this is consistent with country conditions. That's immigration judge's decision. And judge says that everything he says could be true, and further states that testimony has been corroborated by some evidence on record. That all is on page 26. In her closing statement, the trial attorney at that hearing states, I quote, Respondent today, yes, he was very consistent about dates and incidents and had explanations as why certain things, comma, why he does not have medical documents. But he really has not explained why he does not have anything from AISSF, that is the All India Sikh Student Federation. So the trial counsel's only objection to this Respondent was that he did not provide more documentation from All India Sikh Student Federation other than the membership receipt that he had already submitted. As far as the fact of Respondent being a Sikh, Respondent put that in his asylum application. Respondent testified to that in his credible welfare interview and even at the airport interview. And Respondent also testified in court that he is a Sikh. Having said that he is a Sikh and follows the presumption that he does follow the Sikh tenets, he does wear the five k's, and if the government had any doubt about the veracity of that statement, the government could have cross-examined the Respondent whether or not he was following those tenets or not. When Respondent said at the airport that I don't remember, he did not say that after a gap of a long period of time. He said that right after the last question was asked. He said that before he signed that interview notes at the airport. About the rallies and the details, Respondent has given details of the date of the incident, the location of the incident, the purpose of their gathering there, the behavior of the police, his detentions, and all the subsequent details of what happened to him in the detentions. He does not just say it was in a Gurdwara. He says it was in my village Gurdwara. And Respondent has testified and given writing where does he live, where is his native village, and it is happening in that Sikh temple. Where Respondent says I was in front of the office of district magistrate. He says it was in the city of Jalandhar. It is a thoroughly detailed claim. I believe the I.J. also had the predisposition to think that it was a boilerplate claim, and the I.J. in his decision at page 30 of the record also states anyone can make up an asylum claim. If he can't, referring to the Respondent, who can? He's an educated man. The I.J. did not give any reasoning for discrediting the Respondent's testimony. There is absolutely no rebuttal. There is absolutely nothing in the record to show that Respondent did not testify credibly to the facts that he stated, to his identity. He did submit his driving license from India. He did submit his photo ID on the record. The two affidavits, one is from the village elder, one is from a municipal commissioner. Both of these people knew Respondent personally, and they testified to him being subjected to this past persecution. Even the immigration judge in his decision also noted that maybe he is from India, but I don't know if he is a Sikh or not. Well, whether he is a Sikh or not, Respondent did his testimony having been totally unrefuted and unchallenged, warranted a favorable exercise of discretion by the immigration judge. Thank you, Your Honor. Thank you, counsel. Case just argued will be submitted. The next case for oral argument is
judges: Lay , Reinhardt, Thomas